WATSON, Judge.
This is a workmen’s compensation case wherein plaintiff, L. C. Bailey, seeks benefits for total and permanent disability. There is no dispute that plaintiff was injured on September 11, 1972, while in the course and scope of his employment with one James H. Brown (hereafter called “Brown”); that plaintiff was disabled from the date of the accident until March 28, 1973, and that his earnings were such as to entitle him to a compensation rate of $49.00 per week if he was in fact entitled to compensation benefits.
The defendants are R. A. Bennett, Jr. (hereafter called “Bennett”) and his workmen’s compensation insurer, Southern Casualty Insurance Company (hereafter called “Southern”).
This is a pulpwood industry case— Brown being what is known as a producer and Bennett, a dealer.
The trial court found in favor of defendants, Bennett and Southern, and dismissed plaintiff’s suit at his costs. Plaintiff has perfected a devolutive appeal to this court contending that the trial court erred in holding that the relationship between Brown and Bennett was a vendor-vendee relationship and in finding that the workmen’s compensation act did not extend Southern’s coverage to Bailey’s employment by Brown.
Plaintiff contends that he was a statutory employee under the provisions of LSA-R.S. 23:1061, which provides essentially that a principal is liable in compensation to an employee of a contractor engaged to perform work which is part of the principal’s trade, business or occupation.
The basic facts surrounding Bennett’s and Brown’s business relationship and plaintiff’s employment were agreed by the parties, as follows:
“At and for some time prior to the plaintiff’s injuries complained of in this case, defendant Bennett was one of several dealers to whom Boise Southern Company — the operator of a paper mill in Beauregard Parish, Louisiana — purchased wood used in the plant operations. Boise purchased pulpwood from these dealers under an arrangement whereby Boise would periodically give the said dealers purchase order agreements for the purchase of a certain amount of pulpwood at certain prices under certain conditions depending upon the length of the haul, et cetera. The dealers were not rigidly held to delivery of the quantity covered in the purchase order. Bennett and the other dealers— in turn — deal with certain persons who are referred to as producers, and who have their own trucks and equipment and employ their own help such as cutters, loaders and others — all of whom are hired by the producer and paid by him. Producers may furnish wood which they produce to more than one dealer at the same time but customarily they usually supply only one dealer at a time; although they may move from one dealer to another from time to time. A producer is not bound to produce any particular quantity of wood for a dealer and is free to sell or deliver the wood he produces to other dealers at all times. He may discontinue production or delivery of wood for the account of any. dealer at any time and the dealer may discontinue taking wood from a producer at any time. The producer was encouraged by the dealer to acquire or purchase direct from the owner the timber from which he produced the pulpwood; however, the dealer also acquired the pulpwood direct from landowners and permitted certain producers to move their own with their equipment and crews and produce the pulpwood "timber which was delivered to the mill.
*582 “It is estimated by Bennett that approximately two-thirds of the timber in his operation is acquired by producers themselves. When the dealer makes a contract with the owner himself for the purchase of the timber he maintains only sufficient supervision of the producer’s operations to determine that he cuts and removes the timber in the quantities, dimensions and otherwise in compliance with any other conditions as to protection of land and timber as per purchase agreement with the owner. When the producer acquires his own timber directly by purchase from the owner, Bennett does not go upon the operation. Bennett did not confine his operations to selling and delivering wood to Boise, but during the time in question was also selling and delivering timber to other users of timber in the area- — and specifically, Owen-Illinois, 'East-Tex and Georgia-Pacific.
“It is agreed that each producer is given a paper form which is filled out with certain information identifying the producer and his truck and also identifying the dealer for whose account he is producing the wood which is being delivered to the Boise plant. And this document had to be presented for a truck to be allowed to go into the plant to deliver the wood. Additionally — each producer has a truck card with a number on it. This is a plastic card — somewhat similar to the ordinary gasoline credit card — which has the dealer’s number on it for whose account the wood is being produced and delivered, and also identifies the producer and particular truck making the delivery. In addition to this — when a truck load of wood is delivered to the Boise plant and accepted by them at the scale house, it shows the cordage and the price and date and other information generally reflecting the receipt of the wood for the account of the particular dealer for whom the producer is delivering. At the time of the plaintiff’s accident the plaintiff was' working on timber on the lands of Ray Hauser, and the arrangements for that timber had been made with Mr. Hauser by James Brown, the employer of the plaintiff. The price paid by Bennett to Brown was $18.50 per cord and the amount of $5.00 per cord stumpage was paid to Mr. Hauser. It was established — or is established — to be the common practice in all situations where the producer requested that the stumpage price due by the producer to the owner was paid direct to the latter. The check was actually delivered . . . the checks were actually delivered to Brown, payable to the owner — who in turn delivered them to the owner Mr. Hauser. From the balance of $18.50 per cord after deduction of the stumpage, Brown paid his employees and the cost of operating and maintaining his truck such as truck notes, upkeep, maintenance, gas, oil and other expenses of the equipment.
“The producer was given a price of $18.50 per cord where he purchased the timber from the landowner himself as against $18.00 per cord when the timber was purchased from the owner by Bennett. This is to encourage the producer to purchase his own timber and to avoid the additional trouble to Bennett in supervising the operation of the producer to the limited extent of seeing that he follows specifically the terms of the purchase agreement with the landowner as to size, quantity, protection of the land and young timber and other matters enclosed by the landowner’s contract.
“It is agreed by both parties that the following circumstances and practices existed concerning the relationship between Bennett and Brown at the time Bailey was injured while working on the Hauser timber. The timber which Brown was cutting and delivering to Bennett was acquired by Brown directly from Hauser, the landowner; and Brown was the exclusive owner of the timber so acquired. There was no negotiation or contract between Bennett and Hauser whatsoever. Bennett never at any time came upon the Hauser land *583 while Brown was carrying on his operations thereunder. Brown was solely responsible for paying his employees. He had complete control of when and where his employees worked. Brown was not under obligation to furnish any fixed quota or to cut, deliver or supply Bennett with any fixed amount of timber. Even though he received tickets for sale of wood to Bennett, he was not obligated to do so nor subject to any liability for failure to do so. Bennett did not direct the producer or his employees to report any particular place at any particular time nor to control the time or circumstances under which they worked. Bennett did not undertake to become involved in the financing or purchase of any of the producer’s trucks or equipment and made no advances of money or loans or otherwise to Brown in anticipation of such deliveries by Brown. Bennett did not hold out of the amount payable to Brown or other producers any insurance premiums, income tax or social security withholdings or anything else excetp the stumpage'to the owner when requested as above mentioned.
“Bennett could discontinue receiving wood from Brown at any time and Brown could discontinue delivering wood to Bennett at any time as in their own discretion they saw fit; and without being subject to any liability for such" discontinuance. Brown was free to purchase timber from any one at any price he could negotiate with the landowners and if it was below the standard rate— the saving inured to Brown’s benefit.” (TR. 57-62).
On these facts, the issue is whether Brown is to be legally characterized as a contractor as in Hart v. Richardson, 272 So.2d 316 (La., 1973) and Bellard v. TriState Insurance Company, 282 So.2d 453 (La., 1973), or as a vendor as in Taylor v. Employers Mutual Liability Insurance Company, 220 La. 995, 58 So.2d 206 (1952) and Hadnot v. Southern Casualty Insurance Company, 166 So.2d 15 (La.App. 3 Cir. 1964). In other words, is the Bennett-Brown relationship that of principal and contractor, entitling plaintiff to collect compensation benefits from Bennett’s insurer; or is the relationship that of vendee-vendor which would give plaintiff no rights against Bennett’s insurer?
The Supreme Court has said in Bellard that the test is whether ‘
“ . . . a principal engaged in procuring timber products is actually paying for services in their processing,” 282 So.2d 455.
This court has recently decided the case of Woodard v. Southern Casualty Insurance Company, 289 So.2d 500, handed down January 25, 1974, which involved facts almost identical to the instant matter. Relying on'the Taylor, Hadnot line of jurisprudence this court concluded in Woodard that Bennett, who was the defendant dealer also in that case, was a vendee, not a principal and not a statutory employer. The test was said in Woodard to be the right of control and supervision, which was found absent.
Applying either the “right of control” test of Woodard or the “paying for services in their processing” test of Bel-lard, we conclude in the instant case, as did the trial court, that the relationship between Bennett and Brown was that of vendee-vendor, not principal-contractor. Therefore, Bennett and Southern are not liable to plaintiff for compensation benefits.
Most significant is the fact that Brown located and arranged to buy the timber; Bennett had no part in this but merely purchased the pulpwood after Brown located it, bought the standing trees, felled them, cut the logs, and hauled them to the mill. Bennett did not participate in any of this.
We are cognizant of the Supreme Court’s granting of writs in Woodard, and we look forward to their review of this troublesome area of the law. However, on the basis of the facts as found by the trial *584 court and the applicable statutes and jurisprudence, we find the judgment of the trial court to be correct.
We note that the plaintiff made a contention that Bennett led Brown to believe that he was carrying compensation insurance on Brown’s behalf, and therefore, Bennett is estopped to deny the employment relationship toward plaintiff. This argument involves a non sequitur in that plaintiff cannot claim a right of Brown, who is not even a party to the litigation, even if the facts supported an equitable estoppel theory. The trial judge held that the facts did not support such a theory ; a conclusion in which we find no manifest error.
Costs are taxed against plaintiff-appellant.
Affirmed.